Good morning, Your Honors. My name is Colleen Cassidy and I represent Mr. Bignon. The appeal presents two issues, each an independent ground for reversal of Mr. Bignon's conviction. The first issue was that his arrest on the incorrect suspicion that he was smoking marijuana was not supported by probable cause. And the second issue is that the search of his backpack without a warrant was not a valid inventory search. I'll first address the lack of probable cause for his arrest. The district court based its probable cause determination on four facts, that Mr. Bignon held a hand-rolled cigarette butt between his thumb and forefinger, which officer Stewart believed meant that it was marijuana, that he threw the butt down as the officers approached on the street, on the sidewalk, and that officer Stewart believed that he smelled a slight odor of marijuana in the air, and four, that Mr. Bignon used the word joint to describe the hand-rolled cigarette when he spoke to the police. The significance of each of these facts was undermined by other undisputed facts. It was an undisputed fact that the cigarette that Mr. Bignon smoked and threw down was a half-inch butt. This is established on the video and by the testimony. This undermined any argument that it was peculiar, let alone evidence of a crime, for him to hold it between his thumb and forefinger or to throw it down. Excuse me, let me, could I ask a question? At what point during the interaction between officer Stewart and the appellant did he, did the appellant claim that his cigarette contained hemp and not marijuana? Was it before or after he refused to provide his identification to the officers? Well, it was before. It was before. The refusal to provide identification was not caught on video. The police did not turn on the body cam until they were putting him in handcuffs. Every recording after that, the recordings of all of his use of the word joint were in conjunction with him saying it was a hemp joint and not weed. So it's not absolutely clear exactly when he first used the word joint, but it looks like from all the evidence and even from the testimony, in fact, in the court's factual findings, it's noted that the, he used the word joint and denied that it was, that it was weed and said that it was a hemp joint and Indian hemp. So, you know, exactly what occurred when I, it wasn't all, all captured, but his, his use of that word were in conjunction with the use of the word hemp joint. So, Officer Seward testified that he had participated in more than 200 marijuana enforcement actions, most of which, as far as we can tell, were successful. Don't we, aren't we, don't we give him some deference to his identification of characteristics that reportedly distinguished these from temp tobacco smokers? How can we just disregard that? Well, well, it's not that we have to disregard his experience, but it, it still has to be more than just a gut feeling based on my experience. I mean, He didn't say it was a gut feeling, did he? He cited the smoke quality and how the cigarette was positioned between Mr. Bignon's fingers and then the reference later to joint. You can't just disregard those for observations. Why is that insufficient? I'd like to address those separately because they are really two separate things. One is the way he held it. And the way, the way Mr. Bignon held it is the way that many people hold cigarettes, especially hand-held cigarettes, and especially since it was so tiny and it was so small. But Ms. Cassidy, the test, the test here is in substance, whether taking what was known to the officer as a whole, was there a reasonable ground to suspect that a crime was being committed? And I don't see it as particularly helpful to dissect each piece of an overall picture and treat each piece separately. Well, at, at the same time, Your Honor, you do have to break each fact down and see if it makes sense. For example, his use of the word joint is only relevant as, as the government acknowledges. If it can be taken, taken as an admission that it was marijuana. But if he used that word at the same time as he was denying it was marijuana and said it was just a hemp joint, then that, that inference is unreasonable. It's an unreasonable inference. And so you do have to look at- But it would be more reasonable if an experienced police officer said that he smelled marijuana. Well, I would point, point, Your Honor, to the case of Kent v. Katz, where this court held that you can't, the court just in determining probable cause can't ignore facts that undermine the facts relied on. So in that- Fair, fair enough. So here, this is the fact that his, his denial, his denial that it was weed, specific denial that it was, his claim that it was a hemp joint undermines any inference that joint was an admission. So that, that's a, that's a fact that should be taken out. So then we have his way of holding it and the fact that he dropped it. And that, if that's enough, then any experienced officer can arrest anyone smoking a hand-rolled cigarette on the street, take them into the station, in violation of New York law, by the way, take them down to the station and search all their belongings. And that can't be, that should not be the law. That should not be sufficient because these, these acts, you know, even if officer Stewart and his experience believe that there was suspicious, they are totally consistent with innocent behavior. Ms. Cassie, why don't you move on and address the inventory search? I will. Okay. So, so after taking Mr. Brignone into the station in violation of New York law, the officers searched his backpack, put him in a cell and searched his backpack. They say, for warrants. Okay. Now they, they called it an inventory search, but it is black letter law that a valid inventory search must be designed to produce an inventory. This is the very basis of the inventory search. Well, actually, let me, let me interrupt for a second. You claimed that the written documentation is the sine qua non of an inventory search. And certainly the, the title, the rubric inventory search suggests that you're making a detailed written inventory. But my survey suggests that in Lopez, for example, I think we concluded that officers conducted a valid inventory search, even though they had those standard practice for documenting. And the searches are designed and the exception to the fourth amendment requirement is, is designed also to just identify dangerous items as opposed to or cataloging every particular item that might be found pursuant to an inventory search. So I think that the, the exception is somewhat misnamed and we've upheld the validity of inventory searches before where written inventories haven't been produced. Do you take issue with that understanding? Or do you think an inventory search is always invalid without a written product? Yes, I do take issue with it, Your Honor. And Lopez, there was a written inventory. The issue in Lopez was whether a certain list, a certain listing on the inventory was adequate where it's lumped together some invaluable personal property instead of itemizing every item in an inventory. But it still suggests, excuse me, that doesn't, didn't Lopez still suggest though that you don't write down every item that you necessarily identify. You could group, you don't even, I mean, that suggested to me that you don't really have to write down a complete inventory of what you find. Is that wrong? You do have to, you do have to, you do have to make a list. An inventory is a list. That's what an inventory is. And, and in Lopez also, that search was, was an automobile search and that was conducted according to standardized criteria for the automobile search. And in the case of personal property, there is no standardized criteria at all. The, the, the patrol guide, as Judge Berman found, leaves it up to the officer's discretion. Personal property may be searched. There may be an inventory search. So there's no standardized criteria. And in this case, and in Lopez, that inventory search was done as an inventory search, listing things. And here the testimony was they made no record of it. They had no intention of documenting or recording the content, contents of his backpack. Only if contraband was found, would the contents be vouchers. Now that really should be the end of the analysis because that's a general search. A search, looking around for things, seeing what you find, and if you find contraband, then you record it as, as vouchered evidence. It's a general search, not an inventory search. Upholding a search like this, where the testimony was clear, that there was no, no recording of, of the content and there was no intent to record the content and that that was not the practice. That they just looked and held the property and gave it back unless they found evidence of a crime is not an inventory search. It can't, it can't fit into the exception. Otherwise, anybody can be searched with, with, with, with no justification, with no warrant. If they'd gotten a warrant, they could have searched the backpack or they could have, if they were doing a real inventory search. In other words, just keeping track of what they found. But here there was none of that. In fact, the district court thought that this case stretched, undoubtedly stretched the inventory search exception closer to its breaking point. Okay, very good. We, we've, you've reserved two minutes for rebuttal and we'll hear from the government. Okay, thank you. Thank you. Good morning, your honors. Can everyone hear me okay? Yes, I can. This is, this is Ben Schrier for the government, your honors, and may it please the court. Of the two issues presented in this appeal, I'd like to dive in on the probable cause issue following the same order as the appellant. And I, on the probable cause point, I'd like to start with your question, Judge Carney, that, that you asked the appellant about the timing, the chronology of exactly what Mr. Bignan said to the officers. And by the way, I am used to pronouncing the his own name, so that's how I'm happy to be corrected. Thank you. No problem, your honor. So in terms of the chronology, I think that what you asked Judge Carney, when did Mr. Bignan start saying things along the lines of, it's not weed, it's an Indian cigarette, it's an Indian hemp joint. I think that that's really critical because it speaks to when the probable cause crystallized. And it is not correct as opposing counsel said that it's clear when the shift happened or that he immediately started distinguishing it, or that when he was saying joint and clip, he was denying that it was weed in the same breath. If I could refer your honor's attention to pages 99 to 100 of the appendix in this case, officer Seward's testimony is very clear that when he first approached Mr. Bignan, their first interaction, he said, it's a joint, it's a clip. He did not deny it was weed. He did not say that was hemp. It was only later when the interaction with the police became more confrontational that Mr. Bignan started saying, it's not weed, it's an Indian cigarette, it's an Indian hemp joint. And by that point, the probable cause had already crystallized. And as the case law that the government cited in its brief suggests, protestations of innocence in that context do pre-existing probable cause, because if they could, then anyone could avoid a probable cause arrest merely by denying that they were engaged in wrongdoing. So I think that's a really important point to keep in mind. Judge Parker, I thought that the New York City government had a policy of not making these a marijuana arrest. I assume I may have been mistaken about that, right? No, you are not mistaken, your honor. I believe it was very shortly before this interaction took place, this arrest of Mr. Bignan took place. New York City changed its policy from arresting people for marijuana offenses on the street, smoking marijuana on the street, for example, to merely writing them a summons and letting them go in most circumstances. However, as the record reflects, in this case, there are certain exceptions to that general practice. One of them is when the person on the street refuses to provide identification. And here, Officer Seward testified credibly as the district court found that Mr. Bignan refused to provide identification to the officers on the street, which is the main reason why they arrested him in accordance with NYPD policy as it existed at the time. And in fact, later at the precinct, it is on the officer's body cam footage, Mr. Bignan producing his identification for the first time. It's clear that it's the first time that they're getting his name and his address. Also on the probable cause point, your honors, I also wanted to address opposing counsel's argument about the odor of marijuana being in the air and how this was generalized and not specific to Mr. Bignan. That's not actually the case. Officer Seward also testified that yes, there were other people around, but he observed those other people and he did not see any of them smoking anything. So he sees someone smoking something. He sees no one else smoking anything and he smells a faint odor of marijuana in the air. It was reasonable for Officer Seward to believe that the smell was associated with Mr. Bignan and it was therefore proper for him to take that fact among others into account in determining whether there was probable cause. In the interest of time, your honor, I wanted to address the inventory search exception issue next. And again, I want to start with something that Judge Carney said in her question, which relates to United States v. Lopez, because I think that United States v. Lopez controls this case. I think that the very argument that is being presented here by the appellant is foreclosed by Lopez. The facts underlying Lopez were fairly similar to those of the defendant. There was a combined suppression hearing and bench trial where two police officers testified. They were the police officers who had conducted the inventory search of the defendant's automobile where a firearm, drugs, and drug contraband had been found. One of the officers testified that she produced a written inventory of all items found during an inventory search. The second officer testified that she produced a written inventory only of items of value. But that second officer further testified as follows, and I'm quoting, some cops don't make any lists at all. Some cops may list everything. It is not written anywhere that we have to make any type of list. Let me interrupt for just a minute. I mean, this exception is called an inventory exception, inventory search exception, which suggests that one is making an inventory and that one of the primary purposes is to make sure that nothing goes missing and that the police department isn't accused of taking things that they shouldn't have taken and also to lend a measure of regularity to the search so that it can be very clear that this is not just a general rummaging around search of the kind that Cassidy was comparing this to. Here, there was no standard practice from what we could tell. I mean, it was kind of up to the individual officer, and they're just looking to not make it a list of anything. Why does that really satisfy the inventory search exception? No matter what this kind of, I mean, Lopez, the fact is that there was a written inventory. While it may have been casual and subject to different ways of doing an inventory, there was a document that said we searched X on Y date, and here are the categories of things we found. Yes, Your Honor. Your point is very well taken. To start with your point about the nomenclature here, I thought about that too in the context of reading Lopez. I think this is best explained by the genesis of the term inventory search exception, inventory search, et cetera. It really comes, I think, from the Seminole Supreme Court case on that point, which is South Dakota, the Opperman from back in 1976. That's one of the most fulsome explanations of the inventory search exception. There, the Supreme Court is using the word inventory a little bit differently than its definition as a written list. A written list is one of the individual or a state. In Opperman, the Supreme Court is using it to mean a search where the police look at and find all of the items that are with the individual whose property is being searched. They're not using it in reference to a specific written list. Putting nomenclature aside, to your point more broadly about if they're not ever producing a written list, how could this be aligned with the justification that underlie the inventory search exception? I think they very much are. If you think about what the Second Circuit said, this court rather, said in Lopez, what the Supreme Court has said in its inventory search exception cases, what they're really trying to prevent is selective discretion in terms of whether an inventory search happens. What they're trying to avoid is a situation where, say with Mr. Bignan, say there was no established routine as there was in this case, that every single time an arrestee comes into the precinct and is put in a cell, that that person's property is searched. They're trying to avoid a situation where police officers bring someone like Mr. Bignan to the precinct and they say, you know what, we think that this individual probably has evidence of crime in his property, so we're going to search it and we're going to call it an inventory search so that we don't have to worry about the Fourth Amendment's warrant requirement. We're going to say it's an inventory search and find the evidence of crime and then use it to prosecute him. But that was plainly... This is Judge Parker. Isn't that exactly what happened here? No, it's not, Your Honor. It is the opposite of what happened here. Why not? Why not? Well, Your Honor, because there was no discretion for the officers as to whether to conduct an inventory search of Mr. Bignan's property. Officer Seward and Officer Lavender both credibly testified that every single time an arrestee is brought to the precinct and put in a cell, their property is searched pursuant to the inventory search exception. They have no discretion in that regard. It's always how they operate. So regardless of whether they thought it was likely that Mr. Bignan's property would or would not contain crime evidence, they still would have searched his property. And that's exactly addressing the concern that the Supreme Court and the Second Circuit have discussed in the relevant case law. Whether or not a specific written list is created in some circumstances where there's evidence of crime found versus when there's not doesn't actually get at the justifications underlying the inventory search exception in the way that this overarching policy mandating a search does, right? So if you think about officer safety, one of the primary justifications, there's really no difference as to officer safety whether a specific written list is created in all circumstances. In terms of protecting the police from future claims of loss or theft, admittedly the police would be better protected if there's a detailed written list produced in every single instance. But it's not the case that the police aren't protected at all if a written list is not produced in some circumstances. You still have the process of the officers going through all of the property. Those officers would then be available to make a written statement or testify in any proceeding about a claim of loss or stolen property. So for example, if Mr. I'm sorry, did one of your honors start speaking? I didn't mean to cut you off. I don't think so. I think you could go ahead. Oh, sorry about that. So for instance, let's say that Mr. Bignan had come in with his backpack and it had later been returned to him and then he filed a claim and said, you know what? There was a gold bar in my backpack and you stole my gold bar and now you owe me all this money for this gold bar. If the search had not been conducted at all, the police would really have no way of responding to that claim other than suggesting that it was implausible. But if there's an inventory search that's conducted of the backpack, regardless of whether there is a written list, you still have one, in this case two officers who could testify or make a written statement. No, we looked through the entire backpack. We saw every item that was in the backpack and there was no gold bar in there. So even if there is not a written list produced in every instance, as this court said in Lopez, that does not undermine or relate in any way to the justifications that underpin the inventory search exception. At bottom, it's about the selective discretion of the officers in deciding whether the search is necessary, whether to conduct the search in the first instance. That's what the Supreme Court has been talking about all the way back to Auberman and Wells, what this court talked about in Lopez, what this court more recently talked about in Williams. It's not about the nitty-gritty of the specifics of how the inventory search is memorialized. Thank you. Thank you very much. Okay, we'll hear from Ms. Cassidy. You have two minutes rebuttal. Okay, thank you, Your Honor. Okay, Judge Kearney was exactly right that the requirements, the basic requirement of an inventory documentation and standardized criteria are what makes it an inventory search and reigns in the police from just rummaging through property. Ms. Cassidy, what do you rely on for the proposition that there must be a written inventory in order for inventory search to be invoked? I rely on Florida v. Wells, which says that an inventory search must be designed to produce an inventory. To produce an inventory. An inventory is not something in the mind of the police. It's a document. And Lopez, Lopez addressed the argument that there had to be a written inventory and said that there was one. They said there was one in case. Yes, a written inventory is required. There was a written inventory in Lopez. It wasn't done with the specificity that the appellants argued. In fact, that was my case. It was about the specificity of the of the inventory, the court held that there was a written inventory and never is that there's no case. And no matter what my opponent says about a written inventory not being documented at all to document the search. There are cases that say the documentation was sufficient where it was argued to be insufficient. But this would go far beyond that to say that no documentation is required. And if the police set out to conduct what they call an inventory search with nothing, no intent at all. So let me ask you a question. So if they had a document labeled inventory search, big non backpack, and it says random contents, no gun, no gold, no valuables, period, would that would that satisfy the requirement? I don't think it would, I think they would have to separate out the gun and the cell phone. And obviously, if they had found a gun, but I mean, if it were someone else's backpack, and it just said random contents, no valuable, no, no contraband, why wouldn't that be enough? It might be enough if it was just a bunch of junk. And they said, you know, in value of only some some no valuables and personal personal papers or something that could be enough. But that's, that's not what we have here. What we have here is Oh, no, it wasn't even part of our our drill to write it down. We only wrote it down if we found contraband. And so they just what they're doing is they're slapping the label of an inventory search onto it without without it being a real inventory search. It's really just that they think that they can just search anything, and they can just call it an inventory search. And, you know, the lack of consistency, first of all, I also have to just get get to address this. There was no testimony whatsoever that they had no discretion. There was no testimony that they had no discretion. They said it was their normal practice to search the property of anybody put in the cell. But there was absolutely no testimony that they couldn't decide not to if they wanted to. And in fact, the police guide allowed them to decide on a case by case basis. But even if even if it was it was true that the 44th precinct, they always without fail, search, somebody who was put in a cell all their, their backpack, their purse, whatever they had. That's not consistent across the city. That's not consistent. That's not the kind of consistency that's required. That's not a police policy. That would be one precinct in the South Bronx, deciding that where their precinct is located, they can just rummage through everyone's property, whereas maybe on the Upper East Side, they wouldn't do that. And that's not the standardized criteria that's required. That is just allowing the police to do what they want. And I just like to say one point about the continuing violation of New York law that happened here. It's technically not relevant to the Fourth Amendment issue, but it is relevant to the big picture of what what goes on what the reality is, if this kind of arrest and search is upheld. They arrested a man who was smoking a legal substance on the sidewalk. Supposedly on suspicion of marijuana against New York law, against the New York rules that they're not supposed to bring anyone to the station, they're supposed to give a summons. They said, oh, yes, they said it was because he didn't produce an ID. And Judge Officer Lavender even later, and you should look at Lavender's testimony because it's illuminating. He wasn't called by the government, he was called by the defense, had recorded this arrest. The reason for him being brought to the station was that he had a record of petty offenses, not that he didn't produce an ID. He even staged a photograph at the cell later with the ID in the backpack and admitted that he had set that up and that's not really where they found the ID, that Mr. Bignone just took it out of his pocket. So there's a lot of bad stuff in the record here about violations of New York law. All right. Thank you very much. Thank you very much, Ms. Cassidy. I think that will do. Okay. Thank you both for your arguments. We appreciate them and we will take the matter under advisement.